**FILED**
HARRISBURG, PA

SEP 1 9 2019

Ðm

DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**ISSA G. ZIADEH**
45 South Washington Street
PO Box 219
Greencastle, PA 17225

        Plaintiff

        v.                    Civil No.

**STERLING JEWELERS INC**.
t/a Kay Jewelers, Store #1122
17301 Valley Mall Road, Unit 432
Hagerstown, MD 21740

        Serve:  **STERLING JEWELERS INC**.
                t/a Kay Jewelers
                c/o R.A., The Corporation Trust, Inc.
                2405 York Road, Suite 201
                Lutherville Timonium, MD 21093

    Also Serve:  **STERLING JEWELERS INC**.
                t/a Kay Jewelers
                375 Ghent Road
                Akron, Ohio 44333
        And

**COMENITY BANK**
c/o R.A. The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

        And

**COMENITY LLC**
**t/a Comenity Bank**
c/o R.A. The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

        And

**FARUKH BHUTTA**
17301 Valley Mall Road, Unit 432
Hagerstown, MD 21740

      Defendants

## PLAINTIFF'S VERIFIED COMPLAINT

      COMES NOW, the Plaintiff, Issa G. Ziadeh, pro se, and for his verified Complaint respectfully states as follows:

### JURISDICTION AND VENUE

      1.  This is an action in part arising under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§1681-1681(x); and for intentional misrepresentation, negligent misrepresentation, fraud, respondeat superior and conversion to obtain a money judgment or restitution, monetary civil penalties and other equitable or injunctive relief arising out of Defendants' violations of the FCRA and the common laws of the United States of America.

      2.  This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1355 in that the claim in part involves a federal question and is also based on 1332 (a)(1) diversity of jurisdiction.

      3.  Venue is proper in the United States District Court for the Middle District of Pennsylvania under 28 U.S.C. §§1391(b)-(c) and 395(a).

### ARTICLE III STANDING

      4.  The Plaintiff, Issa G. Ziadeh, has standing to sue Defendants for violations of the FCRA.  Defendants' violations are not merely procedural. The injuries sustained by Plaintiff are particularized and sufficiently concrete, *United States Supreme Court, Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016),* for the purposes of Article III standing.

**PLAINTIFF**

5. This action is brought by Issa G. Ziadeh (hereinafter "Consumer" or "Issa") who is a resident of the Commonwealth of Pennsylvania.

**DEFENDANTS**

6. Defendant **Sterling Jewelers Inc.** t/a Kay Jewelers ("Kay" or "Kays") is a for-profit foreign corporation organized and existing under the laws of the State of Delaware with a principal office located at 320 King Street, Alexandria, Virginia; headquarters located in Akron, Ohio and with retail stores that operate throughout the State of Maryland.  Kays also possesses a business relationship or credit partnership with Comenity Bank or Comenity LLC.

7. Defendants **Comenity Bank** and **Comenity LLC** (hereinafter individually and collectively also referred to as "Comenity") is a state-chartered bank organized and existing under the laws of the State of Delaware with a principal office located in Columbus Ohio.

8. Defendant **Farukh Bhutta** ("Frank") is a resident of the state of Maryland or has sufficient ties thereto in that Frank was a store manager between October 2009 to March of 2019 at Kay Jewelers located in Hagerstown, Maryland (the "Store"); and is currently employed at Helzberg Diamonds located in Clarksburg, Maryland.

**STATEMENT OF FACTS**

9. On or about September 21, 2017, Consumer made a credit purchase from Kays on Issa's Kays-credit-card-account:  The sale was made by Frank for an 18-karate gold chain and an 18-karate gold cross (the "Special Purchase").

10.  On or about September 22, 2017, Kays billed Issa's Kays-credit-card-account in the amounts of $3,000 for the chain and $3,000 for the cross[1].

11.  Kays represented that the Special Purchase will take no more than six to eight weeks to complete.

12.  Approximately one year went by and the Special Purchase had not been completed.

13.  At which time, Issa told Frank that Issa no longer wanted the Special Purchase because of the delay; and Issa asked Frank to cancel the order.

14.  Frank apologized for the long delay and kept insisting that Issa not cancel the order; promising that the Special Order should be ready within approximately one month's time.

15.  In or about the month of October 2018, Frank contacted Issa and advised that the chain and cross were finally ready to be picked-up.  Issa went to the Store to pick-up the Special Purchase.  It was nicely displayed in a jewelry box.

16.  Issa did not remove the Special Purchase from the jewelry box until Issa got home that same day:  In front of Issa's wife, Tracy Ziadeh, and Issa's daughter, Madison Ziadeh ("Madison"), Issa removed the chain from the box and noticed that the chain was much longer than what Issa had ordered and the cross was outrageously larger than what Issa had expected.

17.  Issa returned the cross to Kays and asked Frank that it be cut down to a more appropriate size.  Frank drew a picture and a line was placed on all four ends of the cross to designate where it should be cut-down.

_____

[1] By this time, Issa had long standing business dealings with Frank, the store manager at Kays, in that Issa had made thousands of dollars' worth of purchases from the Store through Frank. That is to say that Frank had earned a high level of trust from Issa, who relied on Frank to order the same chain that Issa had previously purchased for Issa's son, with the only difference being that it be in 18 Karat gold.

18.  Issa then noticed that the chain, because it was so long or because of a defect in craftsmanship, did not sit flat on Issa's neck.

19.  Frustrated over the whole ordeal, Issa returned the chain and the cross to Frank and demanded a full refund.  Kays does not dispute that the Special Purchase was returned to Kays.

20.  At first, Kays refused to issue a refund.

21.  After numerous communications between Issa and Frank, Frank advised Issa that Kays under the circumstances finally agreed to refund the cost of the Special Purchase.

22.  Two and then three months went by and Issa noticed that the charges for the subject return did not yet appear on Issa's Kays-credit-card-statement.

23.  On two or three different occasions, Issa went to Kays to inform Frank that the credit has not yet been issued or processed.  Frank kept telling Issa that Frank's working on it.

24.  On the second or third occasion, Frank was on the phone with the credit card company, Comenity, and said that it wanted to speak with management about issuing the credit, even though management, as Frank had represented to Issa, had already approved the credit.

25.  It then appeared to Issa that Frank was stalling and really had no intention of issuing a credit to Issa's Kays-credit-card-account.

26.  In passing, Frank mentioned to Issa that Frank and his family were struggling financially.  Issa believed that Frank did not want to lose the commission for the sale of the Special Purchase and therefore was reluctant to issue the subject credit.

27.  Out of sympathy to Frank's financial condition, Issa settled for and agreed to accept a store credit in the amount of $6,000.

28. To be applied against this store credit, Issa purchased from Frank a 14-karate gold chain (that matched the style of the chain that made-up part of the Special Purchase), with a much shorter length, which Issa wanted to begin with (the "Correct Size Chain").

29. The cost of the Correct Size Chain was applied against Issa's $6,000 store credit.

30. Issa made another purchase or repair, the cost for which was also applied against Issa's $6,000 store credit.

31. After which point, Frank advised Issa that the remaining balance of the store credit was $3,975.00, which Issa remembers joking with Frank to make it an even $4,000.00.

32. In late April of 2019, Issa's daughter, Madison, wanted to purchase wedding bands for her and her finance, Benjamin Funk; and Madison asked Issa if she can purchase them from Kays, the cost of which to be applied against a portion of the remaining balance of Issa's store credit. Issa said of course you can.

33. Issa called Kays to speak with Frank about Madison's interest and intention to visit the store. Issa learned from the new manager that Frank is no longer with Kays; and that the new manager was not aware of Issa's store credit but would look into it, and with great customer service promised that it would be resolved. The new manager told Issa that someone from Kays will contact Issa in one week.

34. After one week went by, and with no contact from Kays, Issa called Kays customer service and explained the whole situation, and this conversation was recorded by Kays. Kays customer service said that someone from management will contact Issa regarding the matter.

35. Approximately one week later, in early May of 2019, "John" from Kay's customer care contacted Issa and told Issa that John has investigated the matter and concluded that Issa is not entitled to the remaining balance of Issa's store credit. Issa plead with John to please

consult with Frank regarding said store credit; that Frank will straighten this whole thing out. John said that he will not reach out to Frank, simply on the basis that Frank was no longer employed with Kays. All conversations between Issa and John were recorded by Kays.

36. Needless to say, after being left under the impression that Frank failed to document Issa's entitlement to the remaining balance of Issa's store credit in the amount of $3,975.00, Issa was very disappointed. Issa felt helpless and suffered from severe anguish including emotional and mental distress. Madison and her finance were forced to pay out of pocket for their wedding bands. It is noteworthy to point out that Issa has no information as to the reason that Frank ended his employment with Kays and went to work for Helzberg Diamonds.

37. Issa prayed and sought out to locate Frank; searched google and social media; and Issa was finally able to locate Frank on Facebook. Frank's Facebook account revealed that effective March 2019 to the present, Frank (became) and is a store manager at Helzberg Diamonds, located at 22705 Clarksburg Road, Suite 928, Clarksburg, MD 20871; and

38. On or about May 26th, 2019, Issa sent a Facebook friend request to Frank and a text via Facebook messenger, which reads as follows:

> "Hi Frank, its Issa. Madison and Ben are getting married and Madison wanted to use a portion of the remaining credit to purchase wedding bands. I called the store and learned that you are no longer there. You left Kay Jewelers without letting them know that I have a store credit left in approximately the amount of $4,000.00. They are treating me like I'm some kind of criminal. Saying that I'm not entitled to the rest of the credit left after returning the 18-karat gold chain and cross (which took over a year to complete). Please help me clarify things with Kays. I asked them to call you so that you can let them

*know of the remaining credit and they refused to even call you.  Please call me*

*or send me an email. issaz@comcast.net Thanks, issa"*

39.  To Issa's surprise and dismay, as of May 30, 2019, Frank had not responded to
Issa's Facebook friend request and message.  Issa feeling helpless sought out to individually
prove Issa's entitlement to the remaining balance of the subject store credit.

40.  On May 31, 2019, Issa sent a letter to both Kays and to Comenity (the "May 31[st]
Letter"), to dispute the balance due on Issa's Kays-credit-card-account in an amount equivalent
to the remaining balance of Issa's store credit, which reads in relevant part as follows:

Re:     Demand for Verification
        Total Alleged Debt: $5,374.48; Disputed Amount: $3,975.00
        Ref. Account No. 7788-5040-5390-1371
        Issa G. Ziadeh (hereinafter "Consumer")
        45 South Washington Street, P.O. Box 219, Greencastle, PA 17225
        Law Firm File No. 7961

Noting that,

*According to the Fair Credit Reporting Act, § 611 [15 U.S.C. §1681 i], if the completeness or*
*accuracy of any item of information contained in a consumer's file at a consumer reporting*
*agency is disputed by the consumer and the consumer notifies the agency directly of such*
*dispute, the agency shall investigate free of charge and record the current status of the*
*disputed information, or delete the item from the file, before the end of the 30-day period*
*beginning on the date on which the agency receives the notice of the dispute from the*
*consumer. Whenever a statement of a dispute made, the consumer reporting agency shall, in*
*any subsequent consumer report containing the information in question, clearly note that it is*
*disputed by the consumer.* Accordingly, Consumer hereby disputes the accuracy of the
alleged debt, and demands that your agency record the status of the disputed information
such that it is clearly noted that it is disputed, or otherwise delete the item from the file
within 30 days.

Also noting that,

*According to § 609[15 U.S.C. §1681 g], Every consumer reporting agency shall, upon request,*
*clearly and accurately disclose to the consumer: (1) All information in the consumer's file at*
*the time of the request; (2) The sources of the information; and (3) Identification of each*
*person that procured a consumer report.* Accordingly, Consumer requests (1) All
information in the consumer's file; (2) The sources of the information; and (3)
Identification of each person that procured a consumer report.

Also noting that,

> NOTICE TO ORIGINAL CREDITOR: § 623. Responsibilities of furnishers of information to consumer reporting agencies [15 U.S.C. § 1681 s-2]: Duty of furnishers of information to provide accurate information; Duty to provide notice of dispute. If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

And noting or demanding that,

Consumer disputes the above referenced disputed amount and, pursuant to 15 USC 1692g Sec. 809 (b) of the FDCPA, Consumer has the right to and hereby requests validation of the alleged debt that you say Consumer owes.  Provide the following:

- Itemization of alleged debt, including principal, interest and costs;
- Dates the alleged debt became due and payable;
- Complete accounting of alleged debt, including payment history; or
- Statements of account from the date of original extension of credit to Consumer through the date on which you respond to this demand for verification.

Please mail your response to the undersigned to the address that appears on this letterhead.  If your offices fail to respond to this validation request within 30 days from the date of your receipt, all references to this account must be deleted and completely removed from Consumer's credit file and a copy of such deletion request shall be sent to the undersigned.

Respectfully,

Issa G. Ziadeh, Esquire

41.   Comenity did not respond to the May 31st Letter, but Kays did respond per its letter dated, June 4, 2019, which reads that "We have validated your account: our records indicate the Long Live Love credit cardaccount [sic] was opened on Nov. 28, 2014… and has a balance of $5,111.46.  Please find enclosed a copy of the billing statement(s) that you have requested." As stated above, Comenity failed to respond and utterly failed to provide Issa with all the information in Consumer's file; and Kays provided only the most recent or twelve months of statements, which reflect only payments and no charges.

42. In response to this failure to provide copies of all relevant documents and Kay's

lack of meaningful investigation, Issa wrote another letter to both Kays and to Comenity dated,

June 30, 2019, (the "June 30[th] Letter") which reads in relevant part as follows:

On May 28, 2019, and pursuant to § 609[15 U.S.C. §1681 g] of the FCRA, Consumer requested that your offices clearly and accurately disclose to Consumer: (1) All information in Consumer's File at the time of the request; (2) The sources of the information; and (3) Identification of each person that procured a consumer report (a copy of said letter is attached hereto). In response to this request, you sent the attached letter, dated 06/04/2019, and provided statements (copies of which are also attached), but only for the following time-periods:

| Date | Purchases | | Balance |
|---|---|---|---|
| 07/01/18 | $ | - | $ 7,676.65 |
| 08/01/18 | $ | - | $ 7,475.91 |
| 09/01/18 | $ | - | $ 7,273.40 |
| 10/01/18 | $ | - | $ 7,069.33 |
| 11/01/18 | $ | - | $ 6,863.49 |
| 12/01/18 | $ | - | $ 6,656.01 |
| 01/01/19 | $ | - | $ 6,446.90 |
| 02/01/19 | $ | - | $ 6,235.83 |
| 03/01/19 | $ | - | $ 6,023.17 |
| 04/01/19 | $ | - | $ 5,808.80 |
| 05/01/19 | $ | - | $ 5,592.49 |
| 06/01/19 | $ | - | $ 5,374.48 |

You failed to provide copies of statements for the following time periods:

| Date | Purchases | Balance |
|---|---|---|
| 11/28/14 | | |
| 12/01/14 | | |
| 01/01/15 | | |
| 02/01/15 | | |
| 03/01/15 | | |
| 04/01/15 | | |
| 05/01/15 | | |
| 06/01/15 | | |
| 07/01/15 | | |
| 08/01/15 | | |
| 09/01/15 | | |
| 10/01/15 | | |
| 11/01/15 | | |
| 12/01/15 | | |
| 01/01/16 | | |
| 02/01/16 | | |
| 03/01/16 | | |
| 04/01/16 | | |
| 05/01/16 | | |
| 06/01/16 | | |
| 07/01/16 | | |
| 08/01/16 | | |
| 09/01/16 | | |
| 10/01/16 | | |
| 11/01/16 | | |
| 12/01/16 | | |
| 01/01/17 | | |
| 02/01/17 | | |
| 03/01/17 | | |
| 04/01/17 | | |
| 05/01/17 | | |
| 06/01/17 | | |
| 07/01/17 | | |
| 08/01/17 | | |
| 09/01/17 | | |
| 10/01/17 | | |
| 11/01/17 | | |
| 12/01/17 | | |
| 01/01/18 | | |
| 02/01/18 | | |
| 03/01/18 | | |
| 04/01/18 | | |
| 05/01/18 | | |
| 06/01/18 | | |

Please provide copies of statements for said time-periods, specifically from Nov. 2014 through June of 2017, within 30 days from the date of this letter.

43. Kays did not respond to the June 30th Letter, but Comenity did per its letter dated July 2, 2019, which notes that "We have validated the account…" and "We have also investigated the information reported on the credit file and we found the information we are reporting to be accurate.", and Comenity, just like Kays, enclosed only the most recent or twelve months of statements, which reflect only payments and no charges, again failing to provide Issa with all the information is Consumer's credit file.

44. Prior to Issa's June 30th Letter, on June 26, 2019 at 1:03 PM, **Frank finally responded to Issa's Facebook message.** Frank wrote as follows:

> *"Hello Mr. Issa, I am sorry that I don't have the opportunity to resolve this for you. However, I documented everything under your clienteling profile.  They have access to it and you are entitled to that credit."*

45. It would appear that Kays reviewed the "clienteling profile", which is referenced in Frank's message, but Kays intentionally chose not to honor the information documented therein. Issa continued to wonder, "Why is Kays treating me this way?" John at Kays did not tell Issa that John reviewed what Franks calls the "clienteling profile" but only that John would not reach out to Frank to obtain clarity and thus, Kays failed to conduct a meaningful investigation over Issa's claimed entitlement to the remaining balance of Issa's store credit.

46. As a result of refusing to conduct a meaningful investigation, or otherwise ignoring the facts of the investigation, Kays reported inaccurate information to Kay's credit reporting agency, Comenity.

47. Consumer informed Kays that Consumer disputes the accuracy of the information furnished by Kays to Comenity.  Kays continues to furnish the information to Comenity, the

Credit Reporting Agency, without providing notice that such information is disputed by the Consumer.

48.  Comenity utterly failed to comply with §609 of 15 U.S.C. §1681g in that it failed to provide (1) All information in the consumer's file at the time of the request; (2) the sources of the information; and (3) Identification of person that procured a consumer report.

## THE FAIR CREDIT REPORTING ACT

The FCRA was enacted in 1970 and became effective on April 25, 1971, and has been in force since that date.  In 1996, the FCRA was amended extensively by Congress.  Among other things, Congress added Section 623 of the Act, which became effective on October 1, 1997.  Section 621 if the FCRA, 15 U.S.C. §1681s authorizes a consumer to enforce compliance with the FCRA by all persons subject thereto except to the extent that enforcement specifically is committed to some other governmental agency, irrespective of whether the person is engaged in commerce or meets any other jurisdictional test set forth by the FTC Act.

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

### COUNT 1

49.  Section 623(a) of the FCRA describes the duties of furnishers to provide accurate information to Credit Reporting Agencies.  The acts and practices of Kays as alleged constitute violations of the Section 623(a)(1)(B) of the FCRA, 15 U.S.C. § 1681s-2(a)(1)(B), and constitute unfair and deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

50.   Section 623(b)(1) of the FCRA requires furnishers of information to Credit

Reporting Agencies to conduct an investigation when the furnisher receives notice of dispute

from the Credit Reporting Agency in accordance with the provisions of Section 611(a)(2) of the

FCRA, 15 U.S.C. § 1681i(a)(2), and to report the results of the investigation to the Credit

Reporting Agency.  The acts and practices of Kays as alleged constitute violations of Section

623(b) of the FCRA, 15 U.S.C. § 1681s-2(b), and also constitute unfair acts or practices in

violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).


## COUNT III

51.   Section 623(a)(3) of the FCRA provides that if the completeness or accuracy of any

information furnished by any person to any Credit Reporting Agency is disputed to such person

by any consumer, the information must be noted as disputed in the information reported by

such person to any Credit Reporting Agency.  This provision does not require consumer

disputes be in writing.  The acts and practices of Comenity as alleged constitutes violations of

Section 623(a)(3) of the FCRA, 15 U.S.C. § 1681s-2(a)(3), and also constitute unfair or

deceptive acts or practices in violation of the Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).


## COUNT IV

52.   Section 609 [15 U.S.C. §1681 g] provides that every consumer reporting agency

shall, upon request, clearly and accurately disclose to the consumer (1) All information in the

consumer's file at the time of the request; (2) The sources of the information; and (3)

Identification of each person that procured a consumer report.  The acts and practices of

Comenity as alleged constitutes violations of Section 609 of the FCRA, [15 U.S.C. § 1681 g],

and also constitute unfair or deceptive acts or practices in violation of the Section 5(a) of the

FTC Act, 15 U.S.C. § 45(a).

## COUNT V
### Intentional Misrepresentation

"A claim for intentional misrepresentation requires proof of the following elements: (1) that a

representation made by a party was false; (2) that either its falsity was known to that party or

the misrepresentation was made with such reckless indifference to truth to impute knowledge to

him; (3) that the misrepresentation was made for the purpose of defrauding some other person;

(4) that that person not only relied upon the misrepresentation but had the right to rely upon it

with full belief of its truth, and that he would not have done the thing from which damage

resulted if it had not been made; and (5) that that person suffered damage directly resulting

from the misrepresentation. *B.N. V. K.K., 312 Md. 135, 149, 538 A.2d 1175 (1988)* (quoting

*Suburban Mgmt. v. Johnson, 236 Md. 455, 460, 204 A.2d 326 (1964))*. Accord *Moscarillo v.

Prof'l Risk Mgmt. Servs., Inc., 398 Md. 529, 544, 921 A.2d 245 (2007)*."


53.  In exchange for return of the Special Purchase to the Kays store, Frank represented

to Issa that Kay's management, "after much deliberation" finally agreed to refund $6,000.00 or

credit Issa's Comenity credit card account; Frank's said representation was false because, upon

information and belief, Kays management did not provide such authorization; that Frank knew

it was false because, upon information and belief, said refund or credit was never applied to

Issa's Kay's or Comenity credit-card-account; Frank's representation was in fact made for the

purpose of defrauding Issa from his refund in that Frank's intention, with knowledge of Issa's

love for jewelry, was to provide Issa with a store credit and constructively force Issa to

purchase more jewelry from Kays, up to the amount of the store credit; Issa fully believed and

reasonably relied upon Frank's representation that Kays would refund the $6,000.00; as a result

of Frank's misrepresentation, Issa suffered financial damages by not realizing the benefit of his remaining $3,975.00 store credit.

## COUNT VI

### Negligent Misrepresentation

"The tort of negligent misrepresentation requires proof of the following elements: (1) the defendant, owing a duty of care to the plaintiff, negligently assets a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence. *Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 337, 439 A.2d 534 (1982); Weisman v. Connors, 312 Md. 428, 444, 540 A.2d 783 (1988).*"

54.  In exchange for return of the Special Purchase to the Kays store, Frank represented to Issa that Kay's management, "after much deliberation" finally agreed to refund $6,000.00 or credit Issa's Comenity credit card account; Frank's said representation was false because, upon information and belief, Kays management did not provide such authorization; that Frank knew it was false because, upon information and belief, said refund or credit was never applied to Issa's Comenity credit card account; Frank's representation was in fact made for the purpose of defrauding Issa from his refund in that Frank's intention, with knowledge of Issa's love for jewelry, was to provide Issa with a store credit and constructively force Issa to purchase more jewelry from Kays, up to the amount of the store credit; Issa fully believed and reasonably relied upon Frank's representation that Kays would refund the $6,000.00; as a result of Frank's misrepresentation, Issa suffered financial damages by not realizing the benefit of his remaining $3,975.00 store credit.

## COUNT VII

### Fraud, Intentional Misrepresentation by Concealment or Fraudulent Concealment

"The elements of a civil action for fraud are:

"(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." Maryland Environmental Trust v. Gaynor, 370 Md. 89, 97, 803 A.2d 512 (2002) (quoting VF Corp. v. Wrexham Aviation, 350 Md. 693, 703, 715 A.2d 188 (1998) (in turn quoting Nails v. S & R, Inc., 334 Md. 398, 415, 639 A.2d 660 (1994))); see also Gross v. Sussex, Inc., 332 Md. 247, 257-58, 630 A.2d 1156 (1993); Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 333-34, 439 A.2d 534 (1982).

The misrepresentation element of the tort of fraud may be based on an affirmative misrepresentation of fact; a concealment of fact, which includes a partially misleading disclosure; or a non-disclosure of fact in the face of a duty to disclose.   See Lubore v. RPM Assocs., Inc., 109 Md.App. 312, 329-31, 674 A.2d 547 (1996).   A person commits fraud by concealment when he engages in a deceptive act or contrivance intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter.   U.S. v. Colton, 231 F.3d 890, 898-900 (4th Cir.2000).

In a recent case discussing a claim of fraud by concealment, the federal district court in Maryland, applying Maryland law, further explained:  In order to prevail on a claim of intentional misrepresentation by concealment, or fraudulent concealment, Plaintiff must prove the following elements: (1) Defendant owed Plaintiff a duty to disclose a material fact;  (2) Defendant failed to disclose that fact; (3) Defendant intended to defraud or deceive Plaintiff; (4) Plaintiff took action in justifiable reliance on the concealment;  and (5) Plaintiff suffered damages as a result of the Defendant's concealment.   See Green v. H & R Block, Inc., 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999) (citing Finch v. Hughes Aircraft Co., 57 Md.App. 190, 231-32, 469 A.2d 867, 888 (1984)).   Plaintiff must prove either that Defendant had a

duty to disclose a material fact to them and failed to do so, or that Defendant concealed a material fact for the purpose of defrauding Plaintiff.

<u>Punitive Damages</u>

On June 1, 2016, the Court of Special Appeals of Maryland issued an opinion in *1st Team Fitness, LLC, et al. v. Francesco Illiano*, No. 0136, Sept. Term 2015 (Md. Ct. Spec. App. Jun. 1, 2016) Plaintiffs who seek to recover punitive damages in Maryland in cases like *Illiano* bear the hefty burden to establish actual malice — *i.e.*, actual knowledge of the false representations — by clear and convincing evidence. Thus, in cases where plaintiffs fail to plead or prove sufficient facts to meet their burden, Maryland courts will likely decline to award punitive damages."

55.  Frank represented to Issa that Frank was finally able to convince management to issue a credit to Issa's Kays credit-card-account.  Upon information and belief, management never agreed to do this and thus, Frank made a false representation to Issa; that its falsity was either known to Frank or that the representation was made by Frank with reckless indifference as to its truth; that misrepresentation was made for the purpose of defrauding Issa (leading Issa to believe that Kays would credit Issa's Kays credit-card-account; when it appears now that Kays was not even willing to give Issa a store credit); that Issa relied on the misrepresentation and had the right to rely on it; and Issa suffered compensable injury resulting from the misrepresentation.  Frank had actual knowledge of the false representation, which would entitle Issa to claim punitive damages against both Frank and Kays.

## COUNT VIII

### **<u>Respondeat Superior</u>**

According to *<u>455 Md. 188, 210; 166 A.3d 1026, 1039 2017</u>*, The simple test remains whether the employee's acts "were within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him."

*Sawyer, 322 Md. At 255, 587 A.2d at 470*.   Express authorization is not required.   The analysis considers instead, "whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders." Id.   Another fact is whether the "employee's conduct was 'expectable' or 'foreseeable'." *Sawyer, 322 Md. At 256, 587 A.2d at 470*.

56.   Under the legal theory of respondeat superior, Kays is bound by the product of Frank's misrepresentation to Issa, that product being that Issa is entitled to a store credit for the Special Purchase in full amount of $6,000.00, which misrepresentation was done during and within the scope of Frank's employment as Manager for Kays; that the product of said misrepresentation (namely, the store credit) was done in furtherance (or for the benefit) of Kays, because Issa's remedy would be limited to making more in-store purchases, up to and not exceeding the $6,000 store credit.

## COUNT IX

### Conversion

"According to *189 Md. App. 310, 337, 984 A.2d 361, 377 (2009)*, Conversion has been defined as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it". *Darcars Motors of Silver Spring, Inc. v. Borzym, 379 Md. 249, 261, 841 A.2d 828 (2004)* (quoting *Allied Inv. Corp. v. Jasen, 354 Md. 547, 560, 731 A.2d 957 (1999))*."

57.   The effect of Kay's position to deny Issa his right to the remainder of Issa's store credit is in effect conversion.   Kays accepted the return of the Special Purchase; allowed Issa through Frank to make purchases against Issa's store credit, which reduced the amount of his store credit from $6,000.00 to $3,975.00; and now Kays is denying Issa's entitlement to the remainder of said store credit in the amount of $3,975.00.

WHEREFORE, the Plaintiff, Issa G. Ziadeh, respectfully demands:

1. That judgment be entered against the Defendants, COMENITY BANK and COMENITY LLC, in the principal amount of $3,975.00, reasonable attorney's fees in the amount of $3,000.00, as the Honorable Judge of said Court deems just and proper, civil penalties in the amount of $1,000.00 or more for each violation, plus post-judgment interest to accrue at the legal rate;

2. That judgment be entered against the Defendant, STERLING JEWELERS INC., in the principal amount of $3,975.00, reasonable attorney's fees in the amount of $3,000.00, as the Honorable Judge of said Court deems just and proper, civil penalties in the amount of $1,000.00 or more for each violation, punitive damages in the amount of $1,000,000.00, plus post-judgment interest to accrue at the legal rate;

3. That Judgment be entered against the Defendant, FARUKH BHUTTA, in the principal amount of $3,975.00, reasonable attorney's fees in the amount of $3,000.00 and punitive damages in the amount to be determined by the Honorable Judge of said court to be just and proper, plus post-judgment interest to accrue at the legal rate;

4. Plaintiff respectfully requests any other and further appropriate relief as the nature of Plaintiff's cause may require and as the Court deems just and proper.


## PLAINTIFF'S VERIFICATION

I, Issa G. Ziadeh, the undersigned, state as follows: I am over 18 years of age; I am the individual harmed by Defendants' actions including intentional and negligent misconduct, which amounted to theft or conversion of my personal property; I have reviewed Plaintiff's Complaint, statement of facts, and attachments; and I, Issa G. Ziadeh, hereby declare and affirm under the penalties of perjury that the statement of acts or allegations and beliefs set

forth in Plaintiff's Verified Complaint are true and accurate to the best of my personal

knowledge, information and belief.

By, _____        8-7-2019
        AFFIANT, Issa G. Ziadeh                 Date

## PLAINTIFF'S REQUEST FOR JURY TRIAL

I, Issa G. Ziadeh, the Plaintiff referenced herein, hereby request a jury trial.

By, _____        8-7-2019
        Issa G. Ziadeh                          Date

RESPECTFULLY SUBMITTED,

_____
ISSA G. ZIADEH
45 South Washington Street
P.O. Box 219
Greencastle, PA 17225
Phone: 717-643-0773
Fax: 717-643-1017
issaz@comcast.net
*Pro Se Plaintiff*

  

PRIORITY MAIL
POSTAGE REQUIRED

PRESS FIRMLY TO SEAL



**UNITED STATES POSTAL SERVICE.**

*Retail*

| P | US POSTAGE PAID |
|---|---|
| | **$0.00** |

Origin: 17225
09/18/19
4133160225-07

**PRIORITY MAIL 1-DAY ®**

1 Lb 5.50 Oz

**1005**

EXPECTED DELIVERY DAY:  09/19/19

**C008**

SHIP
TO:
   228 WALNUT ST
   HARRISBURG PA 17101-1714

**USPS TRACKING NUMBER**



9505 5118 2961 9261 2738 42

FROM



RECEIVED
HARRISBURG, PA

SEP 1 9 2019

DM

Deputy Clerk

LAW OFFICES
**ISSA G. ZIADEH, P.C.**
CENTRAL COLLECTIONS UNIT
POST OFFICE BOX 219
GREENCASTLE , PA 17225

U.S. District Court
Middle District of PA
228 Walnut Street
Harrisburg, PA  17101



FILED
HARRISBURG, PA

SEP 1 9 2019

PER _____
        DEPUTY CLERK



P S 0 0 0 0 1 0 0 0 0 1 4

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE


UNITED STATES
POSTAL SERVICE

Court Name: District Court
Division: 1
Receipt Number: 111024383
Cashier ID: rweida
Transaction Date: 09/19/2019
Payer Name: Law Offices of Issa G. Ziadeh

CIVIL FILING FEE
 For: Law Offices of Issa G. Ziadeh
 Case/Party: D-PAM-1-19-CV-001623-001
 Amount:        $400.00

Paper Check Conversion
 Check/Money Order Num: 35858
 Amt Tendered: $400.00

Total Due:        $400.00
Total Tendered: $400.00
Change Amt:        $0.00

Only when bank clears the check or
verifies credit of funds is the fee
or debt officially paid or
discharged. A fee of $53.00 will be
charged for returned checks.